IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LAURA CHUNG,

        Plaintiff,

vs.                                  No.  03cv1004 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Chung's) Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 10]**, filed January 23, 2004, and fully briefed on May 6, 2004.  On February 8, 2002, the Commissioner of Social Security issued a final decision denying Chung's claim for disability insurance benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Chung, now forty-six years old, filed her application for disability insurance benefits on April of 2002 (Tr. 34), alleging disability since October 31, 1994, due to rheumatoid arthritis and Sjorgren's syndrome.[1]  Chung was last insured for Social Security Disability benefits on

---

[1] Sjogren's Syndrome is a chronic, systemic inflammatory disorder of unknown cause, characterized by dryness of the mouth, eyes, and other mucous membranes and often associated with rheumatic disorders sharing certain autoimmune features, for example, rheumatoid arthritis. Sjogren Syndrome may affect only the eyes or mouth (primary Sjogren's Syndrome, sicca complex or sicca syndrome), or generalized collagen vascular disease may be present (Secondary Sjogren's Syndrome).  *The Merck Manual* 423 (17th ed. 1999.)

December 31, 1998.  Hence, Chung must show she was disabled prior to the expiration of her

insured status.  Chung has a high school education (Tr. 130) and past relevant work experience as

a clerk for the United States Postal Service.  Tr. 134.  On February 8, 2002, the Administrative

Law Judge (ALJ) denied benefits, finding Chung's rheumatoid arthritis was severe but did not

meet or medically equal one of the impairments listed in Appendix I, Subpart P, Regulations No.

4.  Tr. 38.  The ALJ also found Chung's Sjorgren's Syndrome and depression were not severe

impairments.  Tr, 37-38.  The ALJ further found Chung retained the residual functional capacity

(RFC) "to perform a limited range of sedentary and light work.; but also that she was unable to

perform the full range of work activities at either exertional level."  Tr. 40.  Finally, the ALJ found

Chung's was not credible.  Chung filed a Request for Review of the decision by the Appeals

Council.  On July 10, 2003, the Appeals Council denied Chung's request for review of the ALJ's

decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for

judicial review purposes.  Chung seeks judicial review of the Commissioner's final decision

pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of

impairments severe enough to limit her ability to do basic work activities, and her impairment

meets or equals one of the presumptively disabling impairments listed in the regulations under 20

C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20

C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Chung makes the following arguments: (1) the ALJ's

RFC assessment is not supported by substantial evidence and is contrary to law; (2) the vocational

findings of the ALJ are not supported by substantial evidence; and (3) the ALJ's credibility

determination is not supported by substantial evidence.

## A.  ALJ's RFC Assessment

Residual functional capacity is defined as "the maximum degree to which the individual

retains the capacity for sustained performance of the physical-mental requirement of jobs."  20

C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an

ALJ to provide a "narrative discussion describing how the evidence supports" his or her

conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's

ability to perform sustained work activities in an ordinary work setting on a regular and

continuing basis . . . and describe the maximum amount of each work-related activity the

individual can perform based on the evidence available in the case record." *Id.*  The ALJ must

also explain how "any material inconsistencies or ambiguities in the case record were considered

and resolved." *Id.*  "The RFC assessment must include a discussion of why reported symptom-

related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.*

Chung contends the ALJ's RFC assessment is not supported by substantial evidence. In support of her contention, Chung points to Dr. Susan Comer's statement of disability. Dr. Comer, a rheumatologist and Chung's treating physician since 1997, submitted a Statement of Ability to do Work-Related Physical Activities on December 21, 2000, opining Chung was disabled **prior** to December 1998. Tr. 331. In that statement, Dr. Comer opined Chung could: (1) occasionally lift less than 10 pounds; (2) frequently lift less than 10 pounds; (3) stand and/or walk for a total of **less than 2 hours** in an 8-hour workday and required a hand held assistive device to ambulate; (4) periodically had to alternate sitting and standing to relieve pain or discomfort; and (5) was limited in her lower extremities as far as pushing and/or pulling.

The ALJ also found Chung was "less than fully compliant with her doctors' recommendations," noting this was "a legitimate consideration in evaluating the validity of an alleged impairment." Tr. 38. In his decision, the ALJ noted:

> There is no question, however, that Claimant has medically determinable impairments that have imposed limitations on her ability to function since before her insured status lapsed at the end of 1998. The earliest medical record in the case file establishes that Claimant experienced symptoms and limitations as early as August 15, 1995. There is, however, no medical evidence to support a finding of onset prior to that date. (Ex. 1F). Claimant testified that she was symptomatic and "demanded extensive testing" to find a diagnosis starting in 1994, but there is no evidence in the record to support these claims.
>
> ** ** ** ** ** **
>
> Claimant has also given accounts of her level of function prior to the end of 1998, which differ dramatically from the reports she was giving to her medical caregivers at the time. At the hearing, she testified that, from 1996 to 1998, she was totally disabled in that she was "totally bedridden," that she could not sit because of "excruciating back pain," that she could not lift even a single piece of paper, that she had to be carried to the bathroom. To the contrary, Claimant told a doctor in August 1995 that she was doing most of the housework and shopping of her family. (Ex. 1F at 152). She did not even mention back pain. She did

complain of morning stiffness involving her hands, lasting six to eight hours, with an exacerbation of severe stiffness towards evening, and migratory arthralgias involving her knees, elbows, wrists, ankles, and hips, and many other symptoms. (Ex. 1F at 153); see also Ex. 1F at 141 and 149-150). Based on her report of symptoms and laboratory test results, rheumatologist, Mark Cohen, M.D., diagnosed Sjorgen's Syndrome. (Ex. 1F at 151-157). For almost a year, however, musculoskeletal examinations failed to reveal evidence of arthritic activity in Claimant's joints. (Ex. 1F at 141-150). In June 1996, Dr. Cohen found tenderness and synovial thickening in virtually all joints of her hands, both wrists, and the right ankle and diagnosed rheumatoid arthritis as well. Ex. 1F at 135). This is the first objective medical evidence in the record to support a finding that Claimant had a medically determinable impairment, which has had a significant effect on her ability to perform basic work activities. Remarkably, the x-ray evidence of record does not reveal evidence of abnormalities consistent with rheumatoid arthritis or any other inflammatory process prior to December 1998. (*See* Ex. 1F at 35 and 87).

** ** ** ** **

Claimant's medical record reveals that her symptoms and limitations have developed gradually over the years, with occasional flares, but also long periods of time with only minimal symptoms. (See Ex. 1F at 87, 93, 135, 141, and 150). At the same time, x-rays of the affected joints revealed very little evidence of arthritic change. (Ex. 1F at 89-90). Starting in mid-1997, Claimant had particular problems with pain and stiffness in the fingers of both hands. (Ex. 1F at 67, 69, and 82). These problems appear to have resolved with the surgery in January 1998. (See Ex. 1F at 30-59). In December 1997, Claimant told her doctor that she considered herself doing very well, though she continued to have waxing and waning pain in her hands and feet and stiffness until about noon. Her other joints were not bothering her. (Ex. 1F at 61). Apparently, this improvement is attributable to Claimant's medication. (Ex. 1F at 63). Similarly, periods during which Claimant is symptomatic are clearly related to her failure to take her medication as prescribed.

Throughout the period under review, Claimant has been less than fully compliant with her doctor's recommendations. This is especially difficult to understand in view of the success her doctors have had in treating her symptoms when she takes the medication as prescribed. (See, e.g., Ex. 1F at 63, 69, and 76; but see Ex.1F at 74, 93, 102, 112, 132, and 135). It is, in fact, difficult to assess the efficacy of her medication regimen from the medical record because Claimant has told her different doctors different stories about when she has taken her prescribed medication and when she has changed the dosage on her own.

Tr. 36-37. The medical records, for the period in question, do not support the ALJ's RFC assessment. At Chung's attorney's request, Dr. Comer submitted a letter on January 14, 2002, in support of her opinion that Chung was disabled prior to December 1998. In that letter, Dr. Comer wrote:

You have asked that a letter be written regarding the above patient's medical situation prior to December 1998.  <u>I have filled out a statement of ability to do work-related physical activity</u> **<u>based on the records I have prior to that date</u>**.  The patient has suffered significant deterioration since then.

Mr. Chung <u>was suffering from active arthritis prior to December of 1998, last evaluated on November 11, 1998</u>.  She had been having problems with pain in her right hand and wrist and in her right foot.  <u>She did have synovial thickening and tenderness over the second and third metacarpophalangeal joint of the right hand, as well tenderness and mild synovial thickening of the right wrist.  She had tenderness to the left wrist as well, although she did not have any swelling there.  Her grip strength was decreased.  She also had tenderness of her right elbow and tenderness and swelling of her right ankle.  The metatarsophalangeal joints of the right foot were also tender</u>.

Thus, she would have some difficulty in fine manipulation of the right hand and restrictions on heavy lifting.  She also would have problems standing or walking because of the arthritis in her foot and ankle.  She actually was quite compliant with taking the Plaquenil that was prescribed for her for the arthritis and varied the amount of Relafen, a non-steroidal anti-inflammatory, appropriately on how much she was hurting.  We did discuss the possibility of treating her with more aggressive medication at that time, which she later actually went on, but felt that it was not necessary at the time.  <u>I certainly would not regard that as noncompliance.</u>

Tr. 372 (emphasis added).  Chung's medical records, for the period in question, support Dr.

Comer's opinion.  The medical records indicate as follows:

**1.  Medical Records**

On August 15, 1995, Dr. Mark H. Cohen evaluated Chung for rheumatoid arthritis.  Tr.

311-314.  Dr. Cohen is a rheumatologist employed at Lovelace Health Systems.  Chung gave a

history of feeling well until late December 1993 or early January 1994.  At that time she had an

acute onset of pain in her left shoulder which lasted one week.  This was followed by "similar

<u>disabling</u> pain involving her right shoulder with migratory arthralgias involving her knees, elbows,

wrists, ankles, and hips thereafter."  Tr. 311 (emphasis added).  Dr. Cohen also noted, "She has

noted heat, swelling and redness in many of these involved joints, and <u>currently has morning</u>

<u>stiffness involving her hands, lasting six to eight hours with an exacerbation of severe stiffness</u>

7

toward evenings." *Id.* (emphasis added).  Dr. Cohen also noted Chung had suffered from oral

ulcer which lasted approximately two weeks and color changes in her fingertips which first

blanched white then became purple with cold exposure.

At that time, Chung was taking 600 mg of Ibuprofen three times a day.  She had

previously discontinued it due to gastrointestinal problems but resumed taking it when she got

little relief from Voltaren, her new medication.  In finding Chung not credible, the ALJ relied on a

statement made by Chung at this visit.  In his decision, the ALJ placed great emphasis on Chung

reporting that she did "most of the housework and shopping herself."  Tr. 36.   However, the ALJ

only cited part of Chung's statement, the part favorable to the agency.  Dr. Cohen noted, "Ms.

Chung does most of the housework and shopping herself, <u>despite currently functioning at a 2 or

poor level</u>."  Tr. 312.  That Chung could do housework or shopping was not an indication that

she could sustain gainful employment.

A review of Chung's systems revealed the following: "Fatigue, weakness, dizziness,

tingling in the hands coincident with swelling of the wrists, diminished memory, tinnitus (ringing

in the ear), a foreign body sensation involving the right eye, dryness of the nose, bleeding gums,

swollen, tender glands, shortness of breath, swollen legs and feet, nocturia, frequent urination,

anemia, easy bruising and very considerable hair loss."  Tr. 312.  The musculoskeletal examination

indicated "full range of motion of all peripheral joints without any evidence of synovitis, nodules,

tophi or effusions."  Tr. 313.  Dr. Cohen's diagnosed Chung as "a 37-year-old woman with a

<u>disabling migratory polyarthritis</u>, Raynaud's phenomenon,[2] and positive SSA antibodies."  *Id.*

---

[2] Raynaud's Phenomenon is a disorder in which spasms of arterioles occur, usually in the
digits, with intermittent pallor or cyanosis.  Raynaud's Phenomenon is secondary to other
conditions, such as scleroderma and rheumatoid arthritis.  *The Merck Manual* 1790 (17th ed.

Dr. Cohen opined rheumatoid arthritis was the "most likely explanation for [Chung's] current clinical presentation." *Id.*

Dr. Cohen ordered a repeat sedimentation rate, a C-reactive protein, rheumatoid factor, RPR, AST, ALT and urinalysis. Dr. Cohen directed Chung to return in two to three weeks. On August 19, 1995, Chung's laboratory results indicated an elevated RA (rheumatoid arthritis factor) test of 29. Tr. 315. The other laboratory tests were normal. Tr. 315-318.

On September 1, 1995, Chung returned for her follow-up with Dr. Cohen. Tr. 310. The examination of the joints was negative for any synovitis. *Id.* Significantly, Dr. Cohen noted,

> The patient returns to 'Rheumatology Clinic for follow-up of arthritis, Raynaud's, keratoconjunctivitis sicca, and positive SSA antibodies, consistent with Sjorgren's syndrome. Despite being off all medications, the patient denies being in any pain or having any swollen joints today, although a review of her diary reveals that her pain has been very migratory and involving one or the other of her wrists and knees, as well as the left ankle.
> Other complaints that have been ongoing and that have not improved since the patient was last seen are dryness of the eyes, nose, and mouth.
>
> ** ** ** ** ** **
>
> The literature given her on her initial visit was obviously read by her, but unfortunately has caused rather considerable anxiety and confusion, which may in part be the result of a **language barrier**.

Tr. 310 (emphasis added). Chung is a native of Seoul, Korea and was adopted by an American family at age 13. Apparently, Dr. Cohen determined there was a language barrier which created problems with the patient-physician relationship. Dr. Cohen directed Chung to return in one month.

On October 9, 1995, Chung returned for her follow-up with Dr. Cohen. Tr. 309. Dr. Cohen noted Chung had suffered migratory arthralgias for the past month, "sufficient enough to interfere with caring for her children." *Id.* (emphasis added). Dr. Cohen also noted, "For reasons

_____

1999.)

unknown, however, her joint symptoms have been relatively quiescent." *Id.* (emphasis added). The physical examination of the musculoskeletal system was negative for signs of inflammatory disease.  Dr. Cohen recommended Chung start on Plaquenil, a medication used in the treatment of arthritis to help relieve inflammation, swelling, stiffness, and joint pain.  Dr. Cohen discussed "the slow acting nature of [Plaquenil]" and "its potential side-effects, to include gastrointestinal upset, skin rash, headache, muscle weakness, temporary blurring of vision at the onset of treatment, and the chance of macular toxicity . . . . " *Id.*  Dr. Cohen ordered a baseline optometric examination and prescribed Plaquenil 200 mg, one daily for ten days and then increasing to 300 mg daily thereafter.  Dr. Cohen directed Chung to return in six weeks.

Dr. Peter Anderson, an ophthalmologist, examined Chung on October 23 and November 7, 1995.  Tr. 308-308.  Dr. Anderson diagnosed Chung with Sjogren's syndrome and inserted punctal plugs in each lower lid to relieve dry eyes.  On November 21, 1995, Chung returned to see Dr. Anderson.  Tr. 306.  Dr. Anderson noted the lower plugs helped Chung's dryness.  On November 22, 1995, Dr. Anderson ordered visual fields.  On November 30, 1995, Dr. Anderson performed the visual fields.

On February 21, 1996, Chung returned for her follow-up with Dr. Cohen.  Tr. 301. Significantly, Dr. Cohen noted, "Up until two days ago she had migratory pain on an almost daily basis.  For some inexplicable reason, she has been essentially pain-free the last two days however." *Id.* (emphasis added).  The physical examination of the musculoskeletal system was "negative for any heat, erythema, effusion or synovial thickening of any peripheral joint." *Id.*  At that time, Chung was taking Plaquenil 300 mg daily.  Dr. Cohen directed Chung to return in three months.

On May 3, 1996, Chung returned to see Dr. Anderson for a six month retina check.  Tr. 300.  Chung had no visual complaints.  Dr. Anderson noted trichiasis (eyelash pointing toward the globe) of one eyelash in the left lower lid.  Dr. Anderson pulled out the eyelash.  Dr. Anderson directed Chung to return in six months for a retina check.

On June 5, 1996, Chung returned for a follow-up with Dr. Cohen.  Tr. 295.  Dr. Cohen noted, "For the last one and one half months [Chung] has been waking with stiff, swollen, painful fingers.  Additionally, she has been having swelling and pain in her feet and ankles.  Her morning stiffness can last up until noon despite her taking Plaquenil, 300 mg daily, which is her only prescribed medication." *Id.*  (emphasis added).  The physical examination of the musculoskeletal system was "remarkable for tenderness and synovial thickening in virtually all of the PIP and MCP joints in both hands.  Both wrists, as well as the right ankle were actively involved with synovitis as well." *Id.* (emphasis added).  Dr. Cohen opined, "Given these new findings, I believe Laura is suffering from RA (Rheumatoid Arthritis) as well as Sjogren's." *Id.*

Dr. Cohen ordered the following laboratory studies: hemogram, chem 16, sedimentation rate, C-Reactive Protein, rheumatoid factor, ALT, hepatitis B antigen and hepatitis C antibody.  Dr. Cohen prescribed a Prednisone burst (20 mg x 4, 15 mg x 4, 10 mg x 4 and 5 mg x 4) followed by Naprosyn 375 mg twice a day with food.  Dr. Cohen gave Chung handouts on rheumatoid arthritis, Methotrexate, and gold, both used in the treatment of rheumatoid arthritis.  Dr. Cohen also referred Chung to Dr. Kline's Stress Management and Mind/Body Wellness class.  Dr. Cohen directed Chung to return in one month.  Chung's laboratory studies revealed an elevated ESR, and elevated RA (rheumatoid arthritis factor) of 243.  Tr. 296-299.

11

On June 26, 1996, Chung returned for her follow-up with Dr. Cohen.  Tr. 292.  Chung reported <u>she was feeling the same even though she had been on high doses of Prednisone</u>.  At that time, Chung was on Plaquenil 300 mg daily, Naprosyn 375 mg twice a day, and an over-the-counter iron supplement twice a day.  Dr. Cohen noted the results of Chung's previously ordered laboratory studies: "Laboratory from June 5 visit was remarkable for a white blood count of 7.1, and H&H (hematocrit & hemoglobin) of 9.5 and 29.3 (abnormally low) respectively, with an MCV (mean corpuscular volume) of 77.2," and "moderately elevated C-Reactive Protein," and a "strongly positive" rheumatoid factor of 243.  Tr. 296-299.  Chung's previous rheumatoid factor had been 29.  Dr. Cohen ordered additional laboratory studies and opined Chung's anemia had to be "corrected as quickly as possible prior to starting yet another medicine."  *Id.*  Dr. Cohen also noted he would notify Dr. Lundblad, Chung's primary care physician, regarding Chung's laboratory results and request his assistance in resolving her anemia.  Dr. Cohen directed Chung to return in six weeks.

On July 17, 1996, at Dr. Cohen's request, Dr. Amy Tarnower, a hematologist/oncologist, evaluated Chung.  Tr. 284-286.  Chung reported a history of anemia for the past six years, hemorrhaging after her c-sections, receiving a transfusion after the birth of her second child, and heavy menses.  Chung also reported taking iron supplements.  Chung complained of dizziness, weakness, and reported she bruised easily.  The physical examination revealed "fusiform enlargement of the fingers bilaterally, most prominent in the index and middle finger."  Tr. 285.  Dr. Tarnower noted Chung's recent laboratory studies: "Most recent CBC (complete blood count) showed a hemoglobin of 9.5, platelet count of 332,000, white cell count [of] 7,1000, MCV [of] 77, RDW (red cell distribution width– calculation of the variation in the size of red blood

12

cells)16.7, creatinine 0.7, liver function tests were normal." *Id*.  Dr. Tarnower also noted

Chung's abnormal laboratory studies regarding rheumatoid arthritis, including a positive ANA,

positive SSA and an elevated sedimentation rate.  Dr. Tarnower ordered more specific laboratory

studies to assess her anemia and directed Chung to return in ten days.

On July 26, 1996, Chung returned for her follow-up visit with Dr. Tarnower.  Tr. 282.

Chung reported the iron supplement was very upsetting to her stomach even when taken with

meals.  Dr. Tarnower opined Chung's anemia was likely caused by her heavy menses as her

laboratory studies did not indicate either an impaired or acquired coagulopathy.  Dr. Tarnower

recommended a different iron-containing compound and directed Chung to return in two weeks.

On August 8, 1996, Chung returned for her follow-up visit with Dr. Tarnower.  Tr. 280.

Chung reported she was taking iron tablets three times a day without problems.  Dr. Tarnower

referred Chung to the gynecological department regarding her surgical option for menorrhagia

(heavy menses).  Dr. Tarnower directed Chung to return in three weeks.

On August 12, 1996, Dr. Stephanie Hedstrom, a gynecologist, evaluated Chung.  Tr. 278-

279.  Dr. Hedstrom diagnosed Chung with menorrhagia and prescribed oral contraceptives to

control the bleeding.  Dr. Hedstrom directed Chung to return in 3 months.

On October 23, 1996, Chung returned to see Dr. Tarnower.  Tr. 276.  Chung reported she

had experienced "for a number of months, most frequently in the evenings, not in any regular

pattern but at least several times a month in which she becomes very short of breath, anxious,

unable to catch her breath or speak for several hours." *Id*.  According to Chung, these episodes

resolved by lying down.  Dr. Tarnower noted Chung's hemoglobin was up to 11.9.  Dr. Tarnower

diagnosed Chung with (1) resolving anemia and (2) episodes of dyspnea, rule out reactive airway

disease.  Dr. Tarnower referred Chung to the pulmonary clinic and directed her to return in three months.

On October 28, 1996, Dr. James Poliner, a pulmonary specialist, evaluated Chung. Tr.272-274.  Chung reported "an approximate one year history of shortness of breath and dyspnea on exertion."  Tr. 272.  Chung also reported <u>she used to exercise on a treadmill for thirty minutes at a brisk walk but had not been able to do so for the past six months secondary to complications of rheumatoid arthritis</u>.  Chung complained of dyspnea when she climbed the stairs in her house and with activities such as housework.  Dr. Poliner noted Chung had discontinued her Plaquenil "secondary to the desire to be off medications" and <u>because it was not providing her significant benefit</u>.  *Id.*  Chung reported she had been on Plaquenil from October 1995 to May of 1996.  Dr. Poliner diagnosed Chung with (1) dyspnea on exertion; (2) Rheumatoid arthritis; (3) Sjogren's syndrome; and (4) iron deficiency anemia.  Tr. 273.  Dr. Poliner prescribed a trial of Proventil inhaler, two puffs four times a day as needed.  Dr. Proventil also ordered a chest x-ray and complete pulmonary function tests.  Dr. Poliner directed Chung to return in one week.

On November 4, 1996, Chung returned for her follow-up visit with Dr. Poliner.  Tr. 267-268.  Chung continued to experience episodes of shortness of breath and dyspnea.  Chung had used the Proventil inhaler with no significant benefit.  The chest x-ray showed some evidence of old calcified granulomatous disease.  However, Chung had a previous history of exposure to tuberculosis.  There was no acute cardiopulmonary process.  The pulmonary function tests were normal.  Dr. Poliner opined Chung's dyspnea on exertion was likely related to anxiety and referred her for biofeedback for management of stress and anxiety.  Dr. Poliner directed Chung to return if the problem persisted.

On December 12, 1996, Chung returned to see Dr. Anderson for her six month retina check.  Tr. 265.  Chung reported <u>discontinuing the Plaquenil three months prior to this visit due to side effects</u>.  Dr. Anderson prescribed new glasses and instructed her to continue using artificial tears.  Dr. Anderson also directed Chung to return in January.

On January 16, 1997, at Dr. Poliner's request, Dr. Ben J. Klein evaluated Chung.  Tr. 262-264.  Dr. Klein is a  psychologist in the Behavioral Medicine Department of Lovelace Health Systems.  Chung reported "that for the past couple of years she has had increasing problems with a constellation of symptoms involving chest pain, shortness of breath, and at times fainting spells when this is severe."  Tr. 262.  Chung also reported taking Prednisone and choosing to taper herself off the Prednisone and simply dealing with the symptoms.  Significantly, Chung reported that "<u>the problem with pain and swelling in her hands in particular has frustrated her and gotten in the way of her ability to do all the things she is used to doing for her children and around the home</u> . . . ."  *Id.*  Dr. Klein noted Chung appeared anxious.  Dr. Klein recommended Chung start to keep a regular journal emphasizing the expression of negative emotional experiences.  Dr. Klein also recommended Chung participate in the Mind-Body Wellness classes.  Tr. 264.

On January 22, 1997, Chung returned to see Dr. Anderson.  Tr. 260-261.  Chung continued to report a "sandy sensation" in both eyes.  Chung reported artificial tears provided only limited relief.  Dr. Anderson noted Chung **had recently restarted Plaquenil 200 mg twice a day.**  Tr. 260.  Dr. Anderson placed punctal plugs in each lower lid and directed her to return in six months for a retina check.

On February 9, 1997, Chung returned to see Dr. Tarnower.  Tr. 256.  Chung reported she had been taking two iron tablets daily and was tolerating them well.  Chung also reported her

energy level was greatly improved over the past several months and was feeling much better.

Chung was taking Dr. Klein's stress reduction classes and reported they were helping her.  Dr.

Tarnower diagnosed Chung as "Resolved iron deficiency anemia in a menstruating female."  *Id.*

Dr. Tarnower recommended Chung continue taking the iron tablets, two tablets daily for a

minimum of six months and directed her to return for a CBC in four months.

On February 27, 1997, Chung returned to the Rheumatology Clinic.  Tr. 253.   Dr. Cohen

noted:

> Laura returns to Rheumatology Clinic after an 8 month hiatus.  She is feeling much better
> now that her anemia is resolved and is no longer feeling as tired and fatigued as she once did.
>
> With respect to her RA, Laura denies being in any pain or having had any major flares since
> her last clinic visit in June.  Unfortunately morning stiffness in her hands is severe enough that
> she cannot make a fist.  Even more ominous is the fact that she is unable to make a fist, even
> by the end of the day.  Plaquenil at 200 mg daily is Laura's only arthritis medicine, and while
> she claims that I recommended that she discontinue taking Naprosyn, my notes suggest
> otherwise.  Furthermore, Laura is supposed to be taking 300 mg of Plaquenil on a daily basis,
> and not the 200 mg as she is doing.

*Id.* (emphasis added).  Dr. Cohen examined Chung, noting, "Examination of the musculoskeletal

system was remarkable for an **inability to make a fist with either hand**.  Second and third

fingers of both hands were **diffusely swollen**, but none of the joints were particularly red or hot."

*Id.* (emphasis added).  Dr. Cohen recommended Chung increase the Plaquenil to 300 mg daily and

add Naprosyn 375 mg twice a day.  Dr. Cohen referred Chung to occupational therapy in the

hand clinic.  Dr. Cohen also noted that more than 50 percent of the visit was spent on counseling

Chung.

On May 15, 1997, Dr. Teresa Balcomb, a specialist in the Hand Clinic, evaluated Chung.

Tr. 247-248.  Dr. Balcomb opined Chung had "probably had [rheumatoid arthritis] for maybe

**eight years**, but the diagnosis was made just two years ago."  Tr. 247 (emphasis added).  Dr. Balcomb noted:

> She feels currently that she is having a very bad flare with all of her joints aching and she is sore.  She has three to four hours of morning stiffness and her main problem is that she has been unable to bend her fingers on her right hand for about **three or four months**.  However, she just felt that this was due to the inflammation, and she just recently mentioned it to Dr. Cohen.  She also did offer that when she would flex her middle finger, it would make a popping noise and hurt terribly, and so she tried not to flex it.

*Id.* (emphasis added).  Dr. Balcomb examined Chung and found as follows:

> She is in some discomfort because of multiple joints that have synovitis.  In fact, her wrist has some significant synovitis on the right.  She has some swelling over the extensor carpi ulnaris.  She has a synovitis in the MP joints of her index and middle finger, and in the thumb on the right hand.  When she tries to make a fist on the right, she either cannot or will not actively flex her fingers.  However, I can passively flex them easily. There does not appear to be a lot of volar synovitis in the fingers nor at the wrist.  The patient has some mild synovitis in the elbow, but she does have full extension, pronation and supination.

*Id.*  (emphasis added).  Dr. Balcomb noted Chung's x-rays showed a good preservation of bony architecture in all of her joints without any subluxation or erosion.  Dr. Balcomb assessed Chung as having "a significant flare of her rheumatoid arthritis."  *Id.* (emphasis added).  Dr. Balcomb opined Chung had "quite a bit of rheumatoid synovitis and was a candidate for additional drug therapy "since she was having so many other joints involved . . . ."  Tr. 248 (emphasis added).  Dr. Balcomb referred Chung for hand therapy to maintain range of motion in her fingers.

On June 9, 1997, Chung returned for her follow-up visit with Dr. Tarnower.  Tr. 243.  Chung reported she was feeling better as far as her anemia but was having a flare of her rheumatoid arthritis.  Chung informed Dr. Tarnower that she would be seeing Dr. Comer instead of Dr. Cohen for her rheumatoid arthritis because she had problems communicating with him.  Chung also requested guidance from Dr. Tarnower regarding how to modify her medication when she had a flare up of her disease versus when she was very stable.  Chung wanted to taper her

medication to the minimum dose when her condition was stable.  Dr. Tarnower assessed Chung

with (1) iron deficiency anemia, resolved and (2) Rheumatoid arthritis with Sjogren's Syndrome.

Dr. Tarnower recommended Chung continue taking Plaquenil 300 mg daily, Naprosyn 375 mg

twice a day, and Prednisone 5 mg daily.   Dr. Tarnower directed Chung to return in six months.

On June 19, 1997, Chung returned to see Dr. Balcomb.  Tr. 242.  Dr. Balcomb noted she

had given Chung an injection in her right middle finger in hopes of decreasing some of the

tendosynovitis, but it had not been helpful.  Dr. Balcomb examined Chung and found "quite a bit

of stiffness in her fingers actively" and found Chung was "not able to flex her index, middle, and

little finger on her right hand and her index and middle finger on her left hand."  *Id.* (emphasis

added).  Dr. Balcomb noted this stiffness had been persistent for some months.  Dr. Balcomb's

assessment and plan were as follows:

> ASSESSMENT:  At this point the patient has fairly active disease clinically with a lot of
> tenosynovitis preventing normoactive motion of her fingers.  That her passive motion is near
> normal with her active motion being so limited is good evidence that her problem is due to
> flexor tenosynovitis.  I doubt that injections are going to help this much since at least the one
> we gave her did not.
>
> PLAN:  The patient has an appointment to see Dr. Comer.  This will be her first visit with Dr.
> Comer in July.  I find from the notes that there has been consideration for placing her on a
> second drug in addition to the Plaquenil and that hadn't been done because of her anemia.  My
> hope is that we can gain control of her tenosynovitis with medications.  If, however, she
> cannot go on another medication or if other medications are not successful then surgery is a
> good alternative for flexor tenosynovitis in restoring function.  I told her to give me a call after
> she saw Dr. Comer.

Tr. 242 (emphasis added).

On June 24, 1997, Chung returned to see Dr. Anderson.  Tr. 240, 241.  Chung reported

little or no change in her gritty sensation symptoms since Dr. Anderson placed the plugs in her

lower lids.  Dr. Anderson Diagnosed Chung with dry eyes and trichiasis.  He pulled three

eyelashes and directed her to return in one month.

On June 30, 1997, Chung returned to see Dr. Cohen.  Tr. 238-239.  Dr. Cohen noted he had last seen Chung on February 27, 1997.  Chung had not been able to keep her two month follow-up appointment.  Dr. Cohen noted that on her last visit Chung had been taking Plaquenil in a sub-therapeutic dose.  He had counseled her to increase the Plaquenil to 300 mg daily, yet she was still taking the same incorrect lower dose of 200 mg daily.  Dr. Cohen also noted Chung was taking Naprosyn 375 mg daily but could not take the twice a day dosage due to gastrointestinal problems.  Chung reported <u>swelling of her right knee for three weeks and pain and cramping in her right calf, aggravated by standing</u>.  Dr. Cohen opined Chung had ruptured a Bakers cyst on her right leg.

Dr. Cohen recommended Chung increase her Plaquenil to 300 mg daily.  Significantly, Dr. Cohen opined:

> Although I feel she needs more aggressive therapy, <u>I am extremely uncomfortable with her understanding of instructions</u>, ability to keep appointments on time, etc.  This is, in fact, only her second clinic visit in the past year which <u>given the activity of her arthritis</u> is unacceptable.  During her June 9 visit to Dr. Tarnower, the patient expressed a desire to see Dr. Comer in hopes that communication with a new physician might be better.  I concur that this is in this patient's best interest and have, in fact, made her an appointment with Dr. Comer for follow-up.

Tr. 238-239 (emphasis added).

On July 15, 1997, Dr. Susan Comer, a rheumatologist, evaluated Chung.  Tr. 234-237.  Dr. Comer's history states:

> HISTORY:  The patient is a 39-year-old Korean female referred to me by Dr. Mark Cohen for a second opinion, evaluation, and taking on of treatment for her rheumatoid arthritis.  She has had <u>joint pains of varying degree for three and a half years</u> and was initially diagnosed after some time with Sjogren's Syndrome, diagnosed one and a half years ago with rheumatoid arthritis.  She <u>has significant pain</u> that was initially migratory and intermittent.  <u>Now every joint in her body hurts.  She is stiff until evening.  She has pain especially in her hands and knees.  The hands are bad enough that she can't make a full fist.  The pains involve her MCP, PIP, joints, and her wrists.  She also has problems with the shoulders, neck, and occasionally in her hips.  Her neck does give her significant problems.  Elbows occasionally bother her as</u>

well.  She gets swelling in the joints and they get warm to touch.  Her energy is significantly decreased. She does have significant alopecia.  She has conjunctivitis, severe sicca syndrome. She used artificial tears and nocturnal ointment for the eyes and has had punctal obliteration recently, about a week ago, which may have helped some.  She also gets mouth ulcers, has dysphagia which she thinks probably is secondary to lack of moisture.  She gets dyspnea at rest and on exertion. She gets fainting spells and lightheadedness.  She has occasional dry cough and when her joints are bad and when she increases activity, she gets pleuritic type chest pains that also hurt more when she moves, possible superficial costochondritis.  She has sporadic problems with nausea, vomiting, and frequent heartburn.  **She is off of Naprosyn that she had been prescribed because it caused significant heartburn**.  She had been prescribed Plaquenil and was taking one a day.  Dr. Cohen had asked her several times to increase it to 1 ½ a day but she hasn't.  **She is concerned because her eyes have been getting progressively worse**. She has blurred vision.  She does get regular eye examinations from the eye doctor, however, and he has not felt that there was any **Plaquenil toxicity**. Presently she is on no medications.  She had been prescribed in addition to Plaquenil, Naprosyn, and some prednisone. She is concerned of the side effects with that.  She does have a history of tuberculosis and is afraid that might reactivate the tuberculosis.

Tr. 234 (emphasis added).  Chung reported she had stopped working because of her arthritis.  Tr. 235.  She also reported she was walking on a treadmill until her ankle and knee started bothering her.  The physical examination revealed "tenderness of both elbows, marked tenderness of the wrists, tenderness and synovial thickening over the MCPs and several PIP joints."  *Id.*  Chung also had trouble making a fist bilaterally, and her grip strength was fair.  Additionally, her knees were tender and her feet revealed bilateral talar bunionettes with tenderness of the MTP joints.

Dr. Comer recommended more aggressive treatment of Chung's rheumatoid arthritis.  Tr. 236.  Dr. Comer prescribed Plaquenil 300 mg daily and Relafen 750 mg, two tablets daily.  Dr. Comer decided not to start the prednisone at this time.  However, Dr. Comer felt that, if Chung needed a stronger second line drug, such as Methotrexate, she would have to see a physician in the Infectious Disease Department to consider the necessity of suppressive therapy for the tuberculosis.   After an extensive discussion with Dr. Comer, Chung understood the beneficial effects of remittive drugs and the trade offs in weighing risks versus benefits.  Chung agreed to give Plaquenil a six month trial.

On October 27, 1997, Chung returned to see Dr. Balcomb.  Tr. 227-228.  Although Chung had been on the increased dose of Plaquenil, she continued to have significant difficulty with her hands.  Dr. Balcomb noted Chung had v<u>olar flexor tenosynovitis preventing her from making a full fist with her fingers and was also beginning to develop some subluxation and laxity of the MP joint of both of her thumbs</u>.  Dr. Balcomb performed a physical examination, noting:

> PHYSICAL EXAMINATION:
> UPPER EXTREMITIES: On examination today, the patient has good passive motion of her fingers, but <u>when she tries to make a fist, there is a lot of ratcheting and pain, and one can feel a nodular thickening along the flexor tendons.  The index and middle fingers of both hands are worse than the ring and little fingers.  Once she is able to make full fist, then she can hold her fingers flexed.  When she extends, however, there is some triggering.  On the thumbs she is getting the typical boutonniere type deformity, Type I, of the thumb.  There is synovitis in her MP joint.</u>  The carpometacarpophalangeal joint and distal joint are intact.  Flexor tendons are all functioning.  There is no evidence of synovitis in the wrist or in the MP joints of the patient's hands.

Tr. 227 (emphasis added).  Because of the synovitis with a deformity beginning in the thumb, Dr. Balcomb recommended surgery and scheduled it for January.  Dr. Balcomb also opined Chung would need extensive physical therapy after the surgery.

On December 1, 1997, Chung returned to see Dr. Tarnower.  Tr. 223.  Chung reported her arthritis was much better controlled on Plaquenil.  Dr. Tarnower assessed Chung as having iron deficiency anemia, resolved and recommended she continue her current medication.  Dr. Tarnower directed Chung to return in six months.

On December 22, 1997, Chung returned for her follow-up with Dr. Comer.  Tr. 221-222.  Dr. Comer noted:

> Patient is here for follow-up of her rheumatoid arthritis.  She considers herself to be doing very well.  <u>She still has pain in her hands and feet which waxes and wanes.  She's stiff in the hands and feet until about noon.  She does get swelling there.</u>  Her other joints which used to be quite painful do not bother her.  Her energy is much better since her anemia has improved.  <u>She does get intermittent fevers, chills, and myalgias that occur for about three hours, about three times a month.  It is of such severity that she goes to bed with hot water bottles under</u>

21

her mother's care.  The rest of the time though, she feels pretty good.  <u>She does get a dry
cough with the fevers and chills.  She does have diarrhea alternating with constipation, and
she's been getting painful mouth ulcers.</u>

Tr. 221 (emphasis added).  Chung was taking Plaquenil 300 mg daily and Relafen 750 mg two

tablets twice a day as needed.  Chung reported she would take the Relafen one week at a time

when the pain got significantly worse.  The physical examination revealed Chung's <u>grip strength</u>

<u>was poor, she had tenderness of the right first MCP and CMC joint and several PIP joints laterally</u>

<u>with minor synovitis present at the thumb.</u>  *Id.*  <u>There was also a boutonniere deformity of the</u>

<u>thumb</u>.

Dr. Comer assessed Chung with active rheumatoid arthritis but sufficiently responsive to

Plaquenil.  Dr. Comer felt Chung "might obtain further benefit from additional drugs or more

powerful [drugs] such as Methotrexate," but Chung's "reluctance to use more traditional

medications and her **self-perception** of significant improvement with Plaquenil" made it

"preferable to stay with the same medication."  *Id.* (emphasis added).

On January 20, 1999, Dr. Balcomb performed a "flexor tenosynovectomy of the index,

ring and little fingers and synovectomy of the MP joint of the right thumb with extensor tendon

reefing and centralization."  Tr. 215.  On January 29, 1998, Chung returned for a suture removal.

Tr. 212-213.

On February 6, 1998, Chung returned for her follow-up with Dr. Balcomb.  Tr. 211.  Dr.

Balcomb noted Chung was unable to make a full fist with her right hand.  Dr. Balcomb referred

Chung to physical therapy and directed her to return in three weeks.

On February 12, 1998, Chung returned to see Dr. Balcomb.  Tr. 210.  Dr. Balcomb noted that "for all intents and purposes, [Chung] had a normally functioning hand now."  *Id.*   No further follow-up was necessary.

On March 23, 1998, Chung returned to see Dr. Comer.  Tr. 206.  Chung reported she was doing very well but complained that her left thumb was bothering her quite a bit.  Chung thought her left hand pain was due to the increased stress that she had placed on the left hand as a result of the surgery on her right hand.  The first CMC joint was deformed.  <u>Chung reported her left hand was stiff and painful in the morning.</u>  <u>The physical examination revealed tenderness and some subluxation of the left first MCP joint in the hand.  Her grip strength was decreased bilaterally.</u> There was no tenderness, swelling or other problems with the elbows, shoulders, hips, knees, ankles or feet.  Dr. Comer recommended Chung take the Relafen on a regular basis to help her left hand pain.  Dr. Comer directed her to return in four months.

On June 1, 1998, Chung returned for her follow-up visit with Dr. Anderson.  Tr. 205.  Dr. Anderson performed an eye examination and assessed Chung as (1) Plaquenil user without retinopathy; (2) dry eyes; and (3) myopia.  Dr. Anderson directed Chung to return in one year, sooner if she experienced increased symptoms.

On June 2, 1998, Chung returned to see Dr. Tarnower.  Tr. 202.  Dr. Tarnower found Chung's iron deficiency anemia was resolved and advised her to continue taking her iron supplement, one tablet daily.  Dr. Tarnower also noted Chung had "improved control of rheumatoid arthritis symptoms."  *Id.*  Dr. Tarnower directed Chung to return in six months.

On June 16, 1998, Chung returned for her follow-up visit with Dr. Comer.  Tr. 199.  Chung <u>reported increased pain and stiffness in her wrists and foot for three days</u>.  The physical

examination revealed "a little tenderness in the left wrist and several PIP joints on the left." *Id.* There was no tenderness of the knees, ankles, feet, shoulders, or elbows. Dr. Comer continued the same medications and directed Chung to return in four months.

On November 11, 1998, Chung returned for her follow-up visit with Dr. Comer. Tr. 193-194. Dr. Comer noted:

> The patient is here for follow up of her rheumatoid arthritis. She is doing ok. <u>She did have a month and a half of increased pain especially in her right hand and wrist and in her right foot.</u> She increased her Relafen 750 mg from one per day to bid (twice a day) at that point but did not call, thinking that this was just part of it. She continues Plaquenil 200 mg 1 ½ per day and multivitamin plus the Relafen 750 mg which she is now back to taking one a day again.
>
> She is not having any fever, chills or sweats. <u>She does have some problems with increased pain and swelling if she over uses her hand.</u>
>
> Her energy is good. She is not having any rash, photosensitivity, mouth ulcers. She does have some sinus congestion for the last three days with cough which she believes is coughing up stuff coming from her nose. She is not having any dyspnea, melena, hematochezia, polyuria, dysuria or hematuria. <u>She is stiff until 1 in the afternoon especially in her hands and right ankle</u>.

Tr. 193 (emphasis added). The physical examination revealed "<u>synovial thickening and tenderness over the 2nd and 3rd MCP joint of the right hand and tenderness and mild synovial thickening over the right wrist</u>." *Id.* (emphasis added). <u>The left hand revealed "tenderness of the wrist as well</u>." *Id.* (emphasis added). Chung could not completely close her index finger on her right hand, and her grip strength was decreased. Her right elbow was mildly tender. Finally, her right ankle was tender with minimal synovial thickening and her MTP joints of the right foot were also tender. Dr. Comer assessed Chung with "Rheumatoid arthritis on Plaquenil since 7/97, with <u>significant synovitis</u>." *Id.* (emphasis added). Dr. Comer ordered x-rays of the hands, wrists, and the right foot. Significantly, Dr. Comer noted she would recommend Methotrexate if the x-rays showed erosive disease. Dr. Comer also noted Chung tended to decrease her Relafen dose when

she was doing better.  However, Dr. Comer did not see this as a problem since Relafen did not have any value as a remittent agent.

On December 3, 1998, Chung returned to see Dr. Tarnower. Tr. 190.  <u>Chung reported feeling well except for joint swelling of the right hand</u>.  Chung also reported she might change from Plaquenil to Methotrexate.  The physical examination revealed swelling of the MP joints.  After reviewing the CBC results, Dr. Tarnower assessed Chung with mild anemia, possibly secondary to iron deficiency versus anemia of chronic disease.  Dr. Tarnower directed Chung to return in six months.

On February 25, 1999, Chung returned for her follow-up visit with Dr. Comer.  Tr. 188-189.  Chung reported doing well since her last visit in November.  Dr. Comer noted Chung had "<u>quite a bit of synovitis in her hands and feet at that time</u>."  Tr. 188 (emphasis added).  Dr. Comer noted <u>Chung was still stiff in the feet, ankles, and hands in the morning on occasion and her right second finger was triggering some</u>.  Dr. Comer noted Chung had not taken Relafen 750 mg for the past two months since she had been doing well.  Dr. Comer had also prescribed a prednisone burst (20 mg x 3 days; 15 mg x3 days; 10 mg x 3 days; and 5 mg x 3 days) for her allergies which also relieved the triggering in her fingers and the swelling she was having in her hands and feet.  Chung was still on steroids at this time.  Tr. 188.  Dr. Comer directed Chung to return in six months.

Chung did not return for her follow-up visit with Dr. Comer until February 18, 2000.  Tr. 171.  Dr. Comer noted:

> The patient returns today for follow-up for rheumatoid arthritis.  She has not been seen since February of 1999, having canceled her August 5th, October 5th and November 5th appointments.  <u>The patient states that she is doing "about the same," but her HAQ score shows significant disability at 2.0 and her pain is 7.5, GI score is 8.5, satisfaction 3, global</u>

health 6.5, and fatigue score is 8.5.  **She is taking Relafen only occasionally as it bothers her stomach quite a bit.  She does have a history of gastric ulcer in the past.**  She is taking Plaquenil 200 mg 1 ½ daily and multiple vitamin daily.  She has had about one episode a month of feeling chills all over body with diffuse myalgias which last for 24 hours.  She had one about a month ago which did not get better and went to the emergency room where she was told she had a bacterial infection and was given antibiotics which cleared it up.  She also is having diarrhea and constipation.

Tr. 171 (emphasis added).  The physical examination revealed tenderness of  "the shoulders, wrists, MCP and PIP joints."  *Id.*  There also was "tenderness of the knees and MTP joints in the feet."  *Id.*  However, there was  "[n]o definite synovial thickening seen except in the right first IP joint where she had definite synovial thickening in the hand."  *Id.*  Dr. Comer assessed Chung as having rheumatoid arthritis with some synovitis and definite difficulty in doing daily activities.  Dr. Comer discontinued the Relafen and prescribed Celebrex 100 mg twice a day.  Dr. Comer directed Chung to return in two months for a follow-up visit.

The Court has carefully reviewed all of the record and finds that the ALJ's RFC assessment is not supported by substantial evidence.  Throughout the period in question, Chung's physicians documented her complaints and noted the supporting objective clinical evidence.  The evidence shows Chung had difficulty with her hands and feet starting in 1995. In fact, Dr. Comer noted in her January 14, 2002 letter of disability that, prior to December 31, 1998, Chung would have had  problems in fine manipulation of the right hand, restrictions on heavy lifting, and problems standing or walking because of the arthritis in her foot and ankle.  The record supports Dr. Comer's opinion.

The ALJ disregarded Chung's physicians' reports and Dr. Comer's opinion of disability on the basis that Chung did not comply with her prescribed therapy.  The ALJ noted:

Specifically, I compared the criteria in Listing 1.02, which describes listing level active rheumatoid arthritis and other inflammatory arthritis, against the evidence concerning

Claimant's condition from June 1996, when her rheumatoid arthritis became clinically active, through the end [of] December 1998. <u>Claimant's doctors' notes reveal that she frequently had joint pain, swelling, and tenderness and that these signs involved multiple major joints, particularly her hands.</u> Appendix 1, Section 1.00D. However, Listing 1.02A also requires that these signs persist "despite prescribed therapy <u>for at least 3 months</u>, . . . ." Listing 1.02A. <u>Claimant's doctors' notes reveal that she did not comply with their prescribed therapy throughout the period between June 1996 and December 1998.</u> Those same notes reveal that, when Claimant did take her medication as prescribed, her condition did not cause "significant restriction of function of the affected joints" for any 12 month period of time, as required by Listing 1.02A.

Tr. 38-39 (emphasis added). However, the evidence does not support the ALJ's findings that Chung did not comply with her physicians' prescribed therapy <u>throughout</u> the period between June 1996 and December 1998 and that Chung's condition did not cause "significant restriction of function of the affected joints for any 12 month period of time" "when [she] did take her medication as prescribed." Tr. 39.

The evidence indicates that on July 15, 1997, Dr. Comer opined that Chung needed more aggressive therapy and prescribed Plaquenil 300 mg daily. Tr. 236. Yet, **over three months later**, on October 27, 1997, Dr. Balcomb evaluated Chung and found that, although Chung had been on the increased dose of Plaquenil, she continued to have <u>significant</u> difficulty with her hands. Tr. 227-228. Dr. Balcomb noted Chung had <u>volar flexor tenosynovitis preventing her from making a full fist with her fingers and was also beginning to develop some subluxation and laxity of the MP joint of both of her thumbs.</u> Dr. Balcomb performed a physical examination and recommended surgery.

Again, on December 22, 1997, Dr. Comer evaluated Chung. Dr. Comer noted, "[Chung] *considers* herself to be doing very well." Tr. 221 (emphasis added). However, Dr. Comer also noted, "She still has pain in her hands and feet which waxes an wanes. She's <u>stiff in the hands and feet until about noon</u>. She does get swelling there." *Id.* (emphasis added). Dr. Comer also

27

noted, "Her grip strength is poor." *Id.* Dr. Comer's clinical notes indicate Chung was on "Plaquenil 200 mg 1 ½  daily." *Id.* Significantly, Dr. Comer opted not to change Chung's medical treatment by adding Methotrexate because Chung's rheumatoid arthritis was active but sufficiently responsive to Plaquenil and because of Chung's "**self perception** of significant improvement." *Id.* (emphasis added).

Chung's **November 11, 1998** visit to Dr. Comer also supports Dr. Comer's opinion of disability. At that visit, Chung reported increased symptoms for one and a half months, especially in her right hand and wrist and in her right foot. Tr. 193. Chung also reported over use of her hand increased the pain and swelling of her hand. Dr. Comer noted Chung was "stiff until 1 in the afternoon especially in her hands and right ankle." *Id.* Dr. Comer performed a physical examination. The findings supported Chung's complaints and support Dr. Comer's opinion of disability. *See* Tr. 193. Dr. Comer assessed Chung with "Rheumatoid arthritis <u>on Plaquenil **since 7/97**, with significant synovitis</u>." *Id.* (emphasis added). Thus, although Chung had been on Plaquenil for one year and four months, she was still having significant problems with her hands and right ankle.

At this visit, Dr. Comer also noted, "[Chung] continues Plaquenil 200 mg 1 ½ per day and multivitamin plus the Relafen 750 mg which [she] is <u>now back to taking one a day again</u>." *Id.* (emphasis added). However, Dr. Comer did not see Chung decreasing her Relafen when she was doing better as problematic because Relafen did not have any value as a remittent agent. Tr. 194.

Moreover, Dr. Comer opined Chung was disabled prior to December of 1998. Under Social Security Administration regulations, the opinion of a treating physician concerning the nature and extent of a claimant's disability is entitled to "controlling weight" when it is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. §404.1527(d)(2).  As a treating physician, Dr. Comer's opinion of disability was entitled to more weight than the opinions of the state agency physicians.  The treating physician's opinion is given particular weight because of his/her "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2),  This requires a relationship of both duration and frequency.  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records."  *Doyle v. Barnhart,* 331 F.3d 758, 762 (10th Cir. 2003) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).  "Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits."  *Id.* at 762-63.

Dr. Comer is considered a treating physician and is also a specialist.  The opinions of specialists related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved.  See 20 C.F.R. § 404.1527(d)(5).  If the opinion of the Chung's physician is to be disregarded, specific legitimate reasons for this action must be set forth.  *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).

In his decision, the ALJ asserts his "residual functional capacity" is not "inconsistent" with Dr. Comer's "retrospective assessment of [Chung's] functional capacity."  The ALJ noted:

On January 28, 2002, just prior to issuance of this decision, Claimant's representative forwarded a letter, signed by Dr. Comer January 14, 2002, concerning Claimant's medical condition prior to December 1998.  This letter has been marked Exhibit 9F and admitted into evidence and I have given this most recent submission careful consideration.  However, <u>Dr. Comer's retrospective assessment of Claimant's functional capacity **is not inconsistent** with the residual functional capacity finding set forth above.  The foregoing decision recognizes that, in November 1998, Claimant was having particular problems with pain in other joints. As set forth above and in Dr. Comer's letter, Claimant was limited **at that time** in her ability to perform work that required fine manipulation and she was limited at that time in her ability to lift and to stand or walk for extended periods.  (Ex. 9F at1).  Also as set forth above and as attested to by the vocational expert at the hearing, these limitations did not prevent Claimant from performing a significant number of jobs.</u>  Dr. Comer's letter also argues that the notes in the medical record do not suggest that Claimant was noncompliant with her doctor's treatment recommendations.  As discussed above, my interpretation of the notes prepared by Claimant's first rheumatologist suggests that he became very frustrated with Claimant's attempts to prescribe her own medication regimen.  (Ex. 1F at 78-158).  On the other hand, Dr. Comer's interpretation suggests only that Claimant felt that the treatment prescribed by her doctor's "was not necessary at the time" (Ex. 9F at 1) because she was not so disabled by pain as she alleged.  For these reasons, Dr. Comer's January 2002 letter, recently submitted, does not dissuade me of the correctness of the foregoing decision.

Tr. 42 (emphasis added).  Contrary to the ALJ's assertion, his RFC assessment is inconsistent

with Dr. Comer's RFC assessment.  Dr. Comer's December 21, 2000 Statement of Ability to do

Work-Related Physical Activities, opining Chung was disabled **prior** to <u>December 1998,</u> indicated

Chung could: (1) occasionally lift <u>less than 10 pounds</u>; (2) frequently lift <u>less than 10 pounds</u>; (3)

<u>stand and/or walk for a total of **less than 2 hours**</u> in an 8-hour workday and required a hand held

assistive device to ambulate; (4) periodically had to <u>alternate sitting and standing to relieve pain or

discomfort</u>; and (5) was limited in her lower extremities as far as pushing and/or pulling.

On the other hand, the ALJ's hypothetical to the vocational expert (VE) set forth the

following limitations:

ALJ:    Let me ask you to assume that the Claimant is 40 years old, has a twelfth-grade education. That she's able to lift <u>20 pounds occasionally</u>, <u>10 pounds frequently</u>.  Can stand <u>up to two hours</u> in an eight hour day.  Can occasionally climb, kneel, balance, stoop, and crouch.  That with her right hand she has a **mild limitation** <u>on handling, fingering, and feeling</u>.  That she should not use her right

hand for repetitive use, and she has moderate limitations on reaching with her right upper extremity.
Are you right-handed or left-handed, ma'am?

Chung:   I'm right handed.

ALJ:   She's right handed.  Based upon that hypothetical, is there work available in the regional or
national economics in substantial numbers that such a person could do?

VE:   Okay.  No.  You mean that whole list of things you went through.  I think I've got it.  Just
take me a minute to look over it, your Honor.  Okay, yes.  In the —

ALJ:   Your answer was yes to my question?

VE:   Yes.

ALJ:   Would you give me three examples of jobs that such a person could do?

VE:   Your Honor, sales attendant is a light, unskilled job.  The DOT is 299-677-010.  There are
4,086,000 jobs in the national economy, and 20,800 jobs in New Mexico.

ALJ:   Would a person be able to do that if they were limited to two hours of standing?

VE:   Well, in this, I should've said counter clerk because you're basically answering customer's
questions.  So I'm going to reduce the numbers by 50 percent, because she's basically– she could sit
and stand–

ALJ:   Okay.

VE:   – but she's not walking around.  She's mainly just standing and sitting, so I'm going to
reduce those numbers by 50 percent.  The right-hand limitation and manipulation is really pretty– I
mean, that's about the only job where she's not doing repetitive use of the right hand.

ALJ:   Would she be able to be a surveillance system monitor?

VE:   Yeah, that allows a sit and stand option.  And, it's within your two hours.  You said stand
and walk two out of eight, and sit six out of eight.  That DOT is 379-367-010.  There's 803,000
jobs in the national economy, and only– a government job– 300 jobs in New Mexico.

ALJ:   Would such a person be able to do such work as an information clerk?  Those kind of people
who greet– you know, sit at the desk and greet people who come in the front door?

VE:   The door greeters usually are standing. You know, like in the Wal-Marts and the KMarts
and that kind of thing.

ALJ:   I'm talking about where you walk in and you ask somebody what floor people are on and all
that.

VE:   Kind of like a guard person?

31

ALJ:     Information Clerk. Isn't that what —

VE:      Well, I got information clerk, clerical, but that's a sedentary, semi-skilled job.  Assembly, sales attendant, bus person.  Well, a rental clerk, you're doing a lot of – no, that's a light job.

ALJ:     Light because of lifting requirements or standing requirements?

VE:      Right, light because of lifting requirements.  But basically you're showing customers merchandise, and then you are ringing up merchandise, filling out rental forms.  So that requires bilateral manual.  Most of these jobs require bilateral manual, Your Honor.

ALJ:     Let me ask you to assume that the Claimant is able to lift 20 pounds occasionally, 10 pounds frequently.  Can stand up to two or walk up to two hours in a six-hour day.  Can sit up to six hours in a six-hour day.  Can occasionally climb, balance, kneel, stoop, crawl, and crouch.  Has a mild limitation on reaching with the right shoulder.  Has a **mild limitation** on handling, fingering, and feeling.  Does that hypothetical change any of your answers to the prior questions?

VE:      I have a question, Your Honor.  When you were saying stand and walk, you said two out of six?

ALJ:     Two out of eight.

VE:      Two out of eight.  And sit–

ALJ:     Six out of eight.

VE:      Six out of eight, okay.  I thought, I — no, it would not change.

ALJ:     Would that make it—

VE:      Oh, the mild—

ALJ:     I've taken out the repetitive–

VE:      Okay.

ALJ:     — use of the hand.

VE:      Yes,

ALJ:     And just said a mild limitation on fingering, handling, and feeling.

VE:      Yes, that would change my testimony.

ALJ:     In what way would it change it?

VE:      It would open up more jobs if it was a mild limitation.  It would reduce the numbers, but more jobs would be opened up.

ALJ:     Can you give me three or more examples?

32

VE:     Three or more examples would be office helper.  That's an unskilled light job.  You're answering phones, delivering messages, that kind of thing.  DOT is 239-567-010.  And there's 2,688,000 jobs in the national economy, and 10,800 in New Mexico.  And I've reduced those numbers by 50 percent because of her mild limitation.

ALJ:    What was the name of that job?

VE:     That was office helper.

ALJ:    And what were the figures in New Mexico?

VE:     10,888 and reduced by 50 percent.  It would open up rental clerk, and that's an unskilled light job.  DOT 311-472-010.  There are 1,034,000 jobs in the national economy, and 603 jobs in New Mexico.  And again, I've reduced that number by 50 percent due to the mild limitation.  Shipping and receiving weigher, unskilled, light.  DOT is 222-387-074.  There are 46,000 jobs in the national economy, and 800 jobs in New Mexico.  And again, I've reduced the numbers by 50 percent.

Tr. 73-77 (emphasis added).  In his decision, the ALJ relied on the VE's testimony and found Chung could perform the jobs of office helper, apparel rental clerk, and shipping and receiving weigher.

However, when Chung's counsel incorporated Dr. Comer's limitations in his hypothetical, the VE testified Chung would not be able to do any of the jobs that she had previously listed.  The VE testified as follows:

Atty:   Ms. Bowman, I'd like you to assume that all of the hypos that Judge Cole posed, in addition to assuming the testimony of the Claimant and her mother.  And assume further, if you will, that she's able to lift only occasionally less than ten pounds, and stand or walk less than two hours out of an eight-hour workday.  And that she would have to periodically alternate between sitting and standing to relieve pain and discomfort.  Would she be able to do any of the jobs that you've suggested?

VE:     No, because of less than ten pounds.  And they don't allow periodic– yeah, some of them do allow periodic sitting and standing.  But the fact that it's less than ten pounds.

Atty:   Okay.  Would rule out—

VE:     Yes.

Atty:   Would rule out all jobs?

VE:      Yes.

Tr. 78-79.   Hence, the ALJ disregarded Dr. Comer's opinion, one "well-supported by medically

acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other

substantial evidence" in Chung's case record.   However, he failed to give specific, legitimate

reasons for doing so.   The ALJ's reasons for finding Chung did not meet Listing 1.02A are also

not borne out by the evidence.   Thus, the Court finds that the ALJ's RFC determination is not

supported by substantial evidence.   The Court further finds that the record fully supports a

determination that Chung was disabled as a matter of law prior to the expiration of her insured

status and is entitled to benefits.   Accordingly, the Court finds that the ALJ's finding that Chung

is not disabled is not supported by substantial evidence and is contrary to law.   Because "[f]urther

administrative proceedings would only further delay the appropriate determination and award of

benefits," *Dixon v. Heckler*, 811 F.2d 506, 511 (10th Cir. 1987), the case is remanded for the

immediate calculation and award of benefits.

A judgment in accordance with this Memorandum Opinion will be entered.


**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**